John M. Morrison
MORRISON SHERWOOD WILSON DEOLA PLLP
401 N. Last Chance Gulch
Helena, MT 59601
Telephone: (406) 442-3261
Fax: (406) 443-7294
john@mswdlaw.com

*Additional attorneys appear on signature page.*

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| DAVID HORNTHAL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SNOWFLAKE, INC., AT&T, INC., and AT&T MOBILITY, LLC,<br><br>Defendants. | Case No.  CV-24-68-BU-TJC<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff David Hornthal ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, brings this Class Action Complaint against Defendants Snowflake, Inc. ("Snowflake"), AT&T, Inc., AT&T Mobility, LLC (together with AT&T, Inc., "AT&T," and with AT&T, Inc. and Snowflake, "Defendants"), and complains and

alleges upon personal knowledge as to himself and information and belief as to all other matters as follows.

## INTRODUCTION

1.      Plaintiff brings this class action against Defendants for their failure to secure and safeguard Plaintiff's and Class members' highly sensitive phone call and text message records, including phone numbers, phone numbers they interacted with, number of calls or texts, call duration, and cell site identification numbers ("Customer Proprietary Network Information" or "CPNI").

2.      AT&T, Inc. is a multinational telecommunications company.  AT&T Mobility, LLC is a subsidiary of AT&T, Inc. and is the second largest wireless carrier in the United States. Snowflake provides an AI data cloud platform to customers across the globe, including AT&T.

3.      On July 12, 2024, AT&T confirmed that call data for nearly all of its customers was illegally downloaded from a third-party cloud platform provided by Snowflake between April 14 and April 25, 2024 (the "Data Breach"). During the Data Breach, unauthorized persons accessed and acquired the CPNI of Plaintiff and Class members for the period from May 1, 2022 to October 31, 2022, and January 2, 2023.

4.      AT&T promised Plaintiff and Class members that they, or the third parties they contract and share data with, would implement and maintain reasonable

and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' CPNI against unauthorized access and disclosure. AT&T breached those promises by, *inter alia*, failing to, or sharing Plaintiff's and Class members' information with third parties who failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' CPNI from unauthorized access and disclosure. Despite storing highly sensitive information on its platform, Snowflake failed to adequately implement basic and necessary security protocols which, if in place, would have prevented the Data Breach from occurring.

5.      As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' CPNI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose CPNI was exposed as a result of the Data Breach.

6.      Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, unjust enrichment, violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, and violations of the Federal Communications Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

# PARTIES

**Plaintiff David Hornthal**

7.      Plaintiff David Hornthal is a citizen and resident of Illinois.

8.      Plaintiff Hornthal has been a customer of AT&T for approximately 24 years. Plaintiff Hornthal paid AT&T for secure cellular, messaging, and data services, including during the period from May 1, 2022 to October 31, 2022, and on January 2, 2023.

9.      At all relevant times, Plaintiff Hornthal used the telecommunications services he obtains from AT&T for personal and business-related communications.

10.     As a condition of providing telecommunication services to Plaintiff Hornthal, Defendants collected, stored, shared, and maintained Plaintiff Hornthal's CPNI on their systems, including the systems involved in the Data Breach.

11.     AT&T sent an email to Plaintiff Hornthal's account notifying him that "some of [his] data was accessed without authorization." The email also informed Plaintiff Hornthal that "the phone numbers of your call and text interactions from May 1, 2022 to October 31, 2022 [and] counts of those calls/texts and total call durations for specific days or months" were stolen in the Data Breach.

12.     Based on representations made by Defendants, Plaintiff Hornthal believed Defendants had implemented and maintained reasonable security and practices to protect his CPNI. With this belief in mind, Plaintiff Hornthal provided

his CPNI to Defendants in exchange for receiving telecommunication services from Defendants.

13.    Had Plaintiff Hornthal known that Defendants do not adequately protect the CPNI in their possession, he would not have agreed to provide Defendants with his CPNI or obtained services from Defendants.

14.    As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive CPNI; deprivation of the value of his CPNI; lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

**Defendant AT&T, Inc.**

15.    Defendant AT&T, Inc. is a Delaware corporation with its principal place of business located at 208 S Akard St., Dallas, TX 75202. It may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801.

**Defendant AT&T Mobility, LLC**

16.    Defendant AT&T Mobility, LLC is a Delaware company with its principal place of business located at 1025 Lenox Park Blvd. NE, Atlanta, GA

30319. It may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, DE 19801.

**Defendant Snowflake, Inc.**

17.    Defendant Snowflake, Inc. is a Delaware corporation with its principal place of business located at 106 E. Babcock St., Suite A, Bozeman, MT 59715. It may be served through its registered agent: Corporation Service Company, 29 W. Sixth Ave., Helena, MT 59624.

## JURISDICTION AND VENUE

18.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

19.    This Court has general personal jurisdiction over Defendant Snowflake because it is a corporation organized under the laws of this State, maintains its principal places of business in this State, regularly conducts business in this State, and has sufficient minimum contacts in this State.

20.    This Court has jurisdiction over Defendants AT&T, Inc. and AT&T Mobility, LLC because they regularly conduct business in this State and contract to supply goods or services in this State.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Snowflake's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

22.    AT&T "provides more than 100 million U.S. consumers with communications experiences across mobile and broadband."[1] AT&T is one of the largest telecommunications companies in the United States.[2] It touts itself as "one of America's critical infrastructure providers."[3]

23.    Snowflake is a "fully managed SaaS (software as a service) that provides a single platform for data warehousing, data lakes, data engineering, data science, data application development, and secure sharing and consumption of real-

---

[1] *Investor Profile*, AT&T, https://investors.att.com/investor-profile (last accessed July 24, 2024).

[2] *E.g.*, Maleha Afzal, *5 Biggest Telecom Companies in the US*, INSIDER MONKEY (Mar. 12, 2024), https://www.insidermonkey.com/blog/5-biggest-telecom-companies-in-the-us-1272969/2/; Nathan Reiff, *10 Biggest Telecommunications (Telecom) Companies*, INVESTOPEDIA (Sept. 29, 2023), https://www.investopedia.com/articles/markets/030216/worlds-top-10-telecommunications-companies.asp.

[3] *2023 Annual Report*, AT&T, https://investors.att.com/~/media/Files/A/ATT-IR-V2/financial-reports/annual-reports/2023/2023-complete-annual-report.pdf (last accessed July 24, 2024).

time / shared data."[4] Snowflake has approximately 9,822 customers from around the world,[5] including AT&T.[6]

24.    In the regular course of its business, AT&T collects and maintains the CPNI of its customers, including Plaintiff and Class members, when they use AT&T's services.

25.    AT&T shared Plaintiff and Class members' CPNI with Snowflake in the course of using services provided by Snowflake.

26.    AT&T claims it maintains "a network and information security program that is reasonably designed to protect our information, and that of our customers, from unauthorized risks to their confidentiality, integrity, or availability."[7]

27.    AT&T's Privacy Notice (the "Privacy Notice") explains how AT&T uses its customers' information and keeps that information safe.[8] The Privacy Notice states, "Your privacy is important to you and to us."[9]

---

[4] Praneal Narayan, *What is the Snowflake Data Platform?*, SNAPLOGIC (Mar. 21, 2023), https://www.snaplogic.com/blog/snowflake-data-platform.

[5] *About Snowflake*, SNOWFLAKE, https://www.snowflake.com/en/company/overview/about-snowflake/ (last accessed July 24, 2024).

[6] *See AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%*, SNOWFLAKE, https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last accessed July 24, 2024).

[7] *2023 Annual Report*, *supra* note 3.

[8] *AT&T Privacy Notice*, AT&T (July 17, 2024), https://about.att.com/privacy/privacy-notice.html.

[9] *Id.*

28.     AT&T collects various types of sensitive information about its customers, including account information, location information, and biometric information, among others.[10] AT&T states it relies on the information it collects "to support our business functions, power our services and improve your experience."[11]

29.     AT&T's Privacy Notice states it will share customers' information with companies providing a service, and that when it does so it "require[s] them to use it only for the intended purpose and to protect it consistent with this notice."[12]

30.     AT&T also collects "Customer Proprietary Network Information (CPNI)," which is "information related to the telecommunications services you purchase from us, such as which subscription plan you have and details about who you called."[13] AT&T admits that it is "your right and our duty under federal law to protect the confidentiality of your CPNI."[14]

31.     Snowflake's website contains a Privacy Notice (the "Privacy Policy") which explains how Snowflake and its affiliates "collect, store, use, disclose and otherwise process information about you in the course of our business."[15]

---

[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Snowflake Privacy Notice*, SNOWFLAKE (Mar. 6, 2024), https://www.snowflake.com/privacy-policy/ [hereinafter, the "*Privacy Policy*"].

32.    In its Privacy Policy, Snowflake promises it takes "all reasonable and appropriate steps to protect your personal information in an effort to prevent loss, misuse, and unauthorized access, disclosure, alteration and destruction."[16] Snowflake further promises it uses "appropriate technical and organizational measures to protect your personal information."[17]

33.    Snowflake promises it will not disclose personal information other than in specific circumstances enumerated in its Privacy Policy.[18]

34.    Plaintiff and Class members are, or were, customers of AT&T who gave AT&T their CPNI, which AT&T in turn shared with Snowflake.

### The Data Breach

35.    On April 19, 2024, AT&T discovered that "threat actors unlawfully accessed an AT&T workspace on a third-party cloud platform and, between April 14 and April 25, 2024, exfiltrated files containing AT&T records of customer call and text interactions that occurred between approximately May 1 and October 31, 2022, as well as on January 2, 2023."[19] In the notice posted on its website, AT&T admits

---

[16] *Id.*
[17] *Id.*
[18] *See id.*
[19] AT&T, *Form 8-K*, SEC.GOV (July 12, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000732717/000073271724000046/t-20240506.htm.

"that AT&T customer data was illegally downloaded from our workspace on a third-party cloud platform."[20]

36.    An investigation into the Data Breach determined that the AT&T customer data compromised in the Data Breach includes:

> [R]ecords of calls and texts of nearly all of AT&T's wireless customers and customers of mobile virtual network operators ("MVNO") using AT&T's wireless network. These records identify the telephone numbers with which an AT&T or MVNO wireless number interacted during these periods, including telephone numbers of AT&T wireline customers and customers of other carriers, counts of those interactions, and aggregate call duration for a day or month. For a subset of records, one or more cell site identification number(s) are also included.[21]

37.    In its website notice, AT&T described the data accessed in the Data Breach as "[t]he call and text records [that] identify the phone numbers with which an AT&T number interacted during this period, including AT&T landline (home phone) customers. It also included counts of those calls or texts and total call durations for specific days or months."[22]

38.    While the CPNI stolen in the Data Breach does not include customer names, AT&T itself admits "there are often ways, using publicly available online tools, to find the name associated with a specific telephone number."[23]

---

[20] *Unlawful access of customer data*, AT&T, https://www.att.com/support/article/my-account/000102979 (last accessed July 24, 2024).
[21] AT&T, *Form 8-K*, *supra* note 19.
[22] *Unlawful access of customer data*, *supra* note 20.
[23] AT&T, *Form 8-K*, *supra* note 19.

39.    AT&T customers were not the only persons affected by the Data Breach, as the stolen data also "includes call records of customers with phone service from other cell carriers that rely on AT&T's network."[24]

40.    Further, the Data Breach is part of a larger compromise of Snowflake's cloud platform by cybercriminals; as many as "165 customers of cloud storage provider Snowflake have been compromised by a group that obtained login credentials through information-stealing malware."[25]

41.    According to an investigation by cybersecurity incident response firm Mandiant, who worked with Snowflake to investigate the Data Breach,[26] there is "a threat campaign targeting Snowflake customer database instances with the intent of data theft and extortion."[27] Mandiant dubbed the cybercriminal group behind the Data Breach "UNC5537," calling it "a financially motivated threat actor . . . systematically compromising Snowflake customer instances using stolen customer credentials,

---

[24] Zack Whittaker, *AT&T says criminals stole phone records of 'nearly all' customers in new data breach*, TECHCRUNCH (July 12, 2024 3:27 AM), https://techcrunch.com/2024/07/12/att-phone-records-stolen-data-breach/.
[25] Dan Goodin, *Hackers steal "significant volume" of data from hundreds of Snowflake customers*, ARSTECHNICA (June 10, 2024 5:08 PM), https://arstechnica.com/information-technology/2024/06/hackers-steal-significant-volume-of-data-from-hundreds-of-snowflake-customers/.
[26] Whittaker, *supra* note 24.
[27] Mandiant, *UNC5537 Targets Snowflake Customer Instances for Data Theft and Extortion*, GOOGLE CLOUD (June 10, 2024), https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion.

advertising victim data for sale on cybercrime forums, and attempting to extort many of the victims."[28]

42.    Mandiant's investigation revealed "UNC5537 obtained access to multiple organizations' Snowflake customer instances via stolen customer credentials."[29] The stolen credentials "allowed the threat actor to gain access to the affected customer accounts and led to the export of a significant volume of customer data from the respective Snowflake customer instances."[30]

43.    Snowflake "supports multi-factor authentication (i.e. MFA) to provide increased login security for users connecting to Snowflake. MFA support is provided as an integrated Snowflake feature, powered by the Duo Security service, which is managed completely by Snowflake."[31] Though Snowflake has the ability to control MFA requirements, Snowflake's "users are not automatically enrolled in MFA. To use MFA, users must enroll themselves."[32]

44.    One of the "primary factors" Mandiant identified for the numerous successful compromises of Snowflake by UNC5537 includes that the "impacted accounts were not configured with multi-factor authentication enabled, meaning

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Multi-factor authentication (MFA)*, SNOWFLAKE, https://docs.snowflake.com/en/user-guide/security-mfa (last accessed July 24, 2024).

[32] *Id.*

successful authentication only required a valid username and password."[33] At the time of the Data Breach, neither AT&T nor Snowflake required all AT&T's Snowflake user accounts to have MFA in place.

45.    While AT&T discovered the Data Breach on April 19, 2024, Defendants did not begin to notify impacted breach victims about the Data Breach until approximately July 12, 2024, over two months after the Data Breach was discovered.[34] Defendants' failure to promptly notify Plaintiff and Class members that their CPNI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that data before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their CPNI will be misused and their identities will be (or already have been) stolen and misappropriated.

### Defendants Knew that Criminals Target Personal Information

46.    At all relevant times, Defendants knew, or should have known, that the information they collect, share, and maintain was a target for malicious actors. Indeed, earlier this year AT&T revealed it suffered another massive data breach after the information of approximately 7.6 million current AT&T account holders and

---

[33] Mandiant, *supra* note 27.
[34] *See* Whittaker, *supra* note 24.

approximately 65.4 million former account holders was released on the dark web.[35]

Despite such knowledge, Defendants failed to implement and maintain reasonable

and appropriate data privacy and security measures to protect Plaintiff's and Class

members' CPNI from unauthorized access that Defendants should have anticipated

and guarded against.

47.    It is well known among companies that store sensitive personally

identifying information that such information is valuable and frequently targeted by

criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the

rise for all kinds of businesses, including retailers . . . . Many of them were caused

by flaws in . . . systems either online or in stores."[36]

48.    Personal information is a valuable property right.[37] The value of

personal information as a commodity is measurable.[38] "Firms are now able to attain

significant market valuations by employing business models predicated on the

successful use of personal data within the existing legal and regulatory

---

[35] *AT&T Addresses Recent Data Set Released on the Dark Web*, AT&T (Mar. 30, 2024), https://about.att.com/story/2024/addressing-data-set-released-on-dark-web.html.

[36] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[37] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[38] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

frameworks."[39] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[40] It is so valuable to identity thieves that once personal information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

49.     "It is routine practice for telecommunications firms to collect, retain, and transfer subscriber telephone records, often dubbed 'Customer Proprietary Network Information.'"[41] Telephone numbers are "more than just a simple set of digits; each number carries a wealth of information referred to as 'metadata.'"[42] Telephone numbers, even when anonymized, are "trivially reidentifiable" through methods such as basic web searches.[43]

50.     This metadata is "a treasure trove of information that can be harnessed for various purposes."[44] Even "imprecise and sparse telephone metadata" could allow a cybercriminal to infer a person's home location.[45] Telephone metadata such

---

[39] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[40] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[41] Jonathan Mayer et al., *Evaluating the privacy properties of telephone metadata*, 113 PNAS 5536, 5540 (2016).

[42] Sean Mallon, *What Your Phone Number's Metadata Means for Data Privacy*, SMARTDATA COLLECTIVE (Aug. 23, 2023 11:21 PM), https://www.smartdatacollective.com/what-phone-numbers-metadata-means-for-data-privacy/.

[43] Mayer et al., *supra* note 41, at 5538.

[44] *Id.*

[45] *Id.*

as that involved in the Data Breach also enables cybercriminals to determine sensitive traits and characteristics of Plaintiff and Class members, such as potential medical conditions, relationship status, religious affiliation, or firearm ownership.[46]

51.     As a result of the real and significant value of this data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security Numbers, personally identifying information, protected health information, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

52.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy— and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[47]

53.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' personal information has thus

_____

[46] *See id.* at 5539–40.
[47] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of Personal Information Has Grave and Lasting Consequences for Victims

54.     Theft of personal information, such as the CPNI stolen in the Data Breach, can have serious consequences for the victim. The FTC warns consumers that identity thieves use personal information to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[48][49]

55.     The information affected by the Data Breach "could be exploited to approximate the location of customers during calls or texts, heightening the risk of economic profiling and targeted scams."[50] The data could also "be leveraged by malicious entities to orchestrate more convincing fraud schemes."[51]

56.     Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information"

---

[48] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed July 24, 2024).

[49] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[50] Kori Hale, *The Unseen Consequences Of AT&T's Data Breach On Minority Communities*, FORBES (Jul. 23, 2024 12:39 PM), https://www.forbes.com/sites/korihale/2024/07/23/the-unseen-consequences-of-atts-data-breach-on-minority-communities/.

[51] *Id.*

by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[52]

57.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[53]

58.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[54]

59.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their CPNI and personal information is forever in cyberspace and was taken by someone intending to use that information for any

---

[52] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[53] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed July 24, 2024).
[54] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and the Other Class Members*

60.    Plaintiff and all other Class members have suffered injury and damages, including, but not limited to: (i) a substantially increased and imminent risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their CPNI; (iii) breach of the confidentiality of their CPNI; (iv) deprivation of the value of their CPNI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

61.    This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

62.    Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All current or former AT&T customers whose CPNI was accessed in the Data Breach by unauthorized persons, including all such persons who were sent a notice of the Data Breach.

63.    Plaintiff also brings this action on behalf of himself and all members of the following Subclass of similarly situated persons (the "Illinois Subclass"):

> All citizens of Illinois whose CPNI was accessed in the Data Breach by unauthorized persons, including all such persons who were sent a notice of the Data Breach.

64.    Excluded from the Class are Snowflake, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, AT&T, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, AT&T Mobility, LLC, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

65.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

66.    The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. A spokesperson for AT&T stated it will notify "around 110 million AT&T customers" of the Data Breach.[55]

67.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

---

[55] Whittaker, *supra* note 24.

    a.  whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' CPNI from unauthorized access and disclosure;

    b.  whether Defendants had duties not to disclose the CPNI of Plaintiff and Class members to unauthorized third parties;

    c.  whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' CPNI;

    d.  whether an implied contract existed between Class members and AT&T, providing that AT&T would implement and maintain reasonable security measures to protect and secure Class members' CPNI from unauthorized access and disclosure;

    e.  whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the CPNI of Plaintiff and Class members;

    f.  whether Defendants breached their duties to protect Plaintiff's and Class members' CPNI; and

    g.  whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

68.    Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

69.    Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his CPNI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and

omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

70.    Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiff has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff and his counsel have adequate resources to assure the interests of the Class will be adequately represented.

71.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

72.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

73.    Defendants owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting the CPNI in their possession, custody, or control.

74.    Defendants knew, or should have known, the risks of collecting, sharing, and storing Plaintiff's and Class members' CPNI, and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted companies storing personal information in recent years.

75.    Given the nature of Defendants' businesses, the sensitivity and value of the CPNI they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems and prevented the Data Breach from occurring.

76.    Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' CPNI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit

appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect CPNI entrusted to it—including Plaintiff's and Class members' CPNI.

77.    It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' CPNI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' CPNI to unauthorized individuals.

78.    But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their CPNI would not have been compromised.

79.    As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their CPNI; (iii) breach of the

confidentiality of their CPNI; (iv) deprivation of the value of their CPNI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

80.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81.    Defendants' duties arise from, *inter alia*, Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to employ reasonable measures to protect and secure personal information.

82.    Defendants violated Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' CPNI and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of CPNI they obtain and store, and the foreseeable consequences of a data breach involving CPNI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

83.     Defendants' violations of Section 5 of the FTCA constitute negligence per se.

84.     Plaintiff and Class members are within the class of persons that Section 5 of the FTCA was intended to protect.

85.     The harm occurring as a result of the Data Breach is the type of harm Section 5 of the FTCA was intended to guard against.

86.     It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' CPNI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' CPNI to unauthorized individuals.

87.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their CPNI; (iii) breach of the

confidentiality of their CPNI; (iv) deprivation of the value of their CPNI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
*Against AT&T, Inc. and AT&T Mobility, LLC*

88.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89.    In connection with receiving telecommunication services, Plaintiff and Class members entered into implied contracts with AT&T.

90.    Pursuant to these implied contracts, Plaintiff and Class members paid money to AT&T and provided AT&T with their CPNI. In exchange, AT&T agreed to, among other things, and Plaintiff understood that AT&T would: (1) provide telecommunication services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' CPNI; and (3) protect Plaintiff's and Class members CPNI in compliance with federal and state laws and regulations and industry standards.

91.    The protection of CPNI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and AT&T, on the other

hand. Had Plaintiff and Class members known that AT&T would not adequately protect its current and former customers' CPNI, they would not have sought telecommunication services from AT&T.

92.    Plaintiff and Class members performed their obligations under the implied contract when they provided AT&T with their CPNI and paid for telecommunication services.

93.    AT&T breached its obligations under the implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their CPNI and in failing to, or contracting and sharing CPNI with companies that failed to, implement and maintain security protocols and procedures to protect Plaintiff's and Class members' CPNI in a manner that complies with applicable laws, regulations, and industry standards.

94.    AT&T's breach of its obligations of the implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

95.    Plaintiff and all other Class members were damaged by AT&T's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk or imminent threat of identity theft—risk justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their CPNI was improperly disclosed to

unauthorized individuals; (iv) the confidentiality of their CPNI has been breached; (v) they were deprived of the value of their CPNI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risk of identity theft they face and will continue to face; and (vii) overpayment for the services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

96.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97.    This claim is pleaded in the alternative to the breach of implied contract claim.

98.    Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to AT&T for telecommunication services (which includes adequate data security measures) and through the provision of their CPNI, which AT&T in turn used to pay Snowflake for its services to AT&T.

99.    Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class Members. Defendants also benefitted from the receipt of Plaintiff's and Class members' CPNI as this was used, *inter alia*, to facilitate payment.

100.   As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

101.   Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

102.   Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

### COUNT V
### VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/2, *et seq*. ("ICFA")
#### *On behalf of the Illinois Subclass*

103.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

104.   Plaintiff brings this claim on behalf of himself and all members of the Illinois Subclass.

105.    AT&T offered and continues to offer telecommunication services in the State of Illinois.

106.    Plaintiff and Illinois Subclass members purchased and received telecommunication services from AT&T for personal, family, or household purposes.

107.    Defendants engaged in unlawful and unfair practices in violation of the ICFA by failing to implement and maintain reasonable security measures to protect and secure Plaintiff's and Illinois Subclass members' CPNI in a manner that complied with applicable laws, regulations, and industry standards.

108.    Defendants make explicit promises to their customers that they will ensure personal information (such as CPNI) will remain private.

109.    Due to the Data Breach, Plaintiff and Illinois Subclass members have lost property in the form of their CPNI. Further, Defendants' failure to adopt reasonable practices in protecting and safeguarding their customer's CPNI will force Plaintiff and Illinois Subclass members to spend time or money to protect against identity theft. Plaintiff and Illinois Subclass members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or motives for Defendants' practice of collecting and storing CPNI without appropriate and reasonable safeguards to protect such information in place.

110.   As a result of Defendants' violations of the ICFA, Plaintiff and Illinois Subclass members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their CPNI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their CPNI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their CPNI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the CPNI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## <u>COUNT VI</u>
## VIOLATIONS OF THE FEDERAL COMMUNICATIONS ACT, 47 U.S.C. §§ 206, 222
### *Against AT&T, Inc. and AT&T Mobility, LLC*

111.   Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112.   AT&T, as a provider of telecommunications services, is a "telecommunications carrier" and "common carrier" as defined in the Federal Communications Act ("FCA"). 47 U.S.C. § 153(51).

113.    Under the FCA, AT&T "has a duty to protect the confidentiality of proprietary information of" its customers, including Plaintiff and Class members. *See* 47 U.S.C. § 222(a).

114.    The FCA further requires that, "Except as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service." 47 U.S.C. § 222(c)(1).

115.    The information accessed and stolen by unauthorized persons in the Data Breach is the type of information covered by Section 222 of the FCA.

116.    Through its acts and omissions as described herein, AT&T allowed hackers to access and acquire the CPNI of Plaintiff and Class members. As such, AT&T violated its duties under Section 222 of the FCA.

117.    Under Section 206 of the FCA, AT&T is "liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of" the FCA. 47 U.S.C. § 206.

118.   As a result of AT&T's violations of the FCA, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their CPNI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their CPNI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their CPNI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the CPNI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

A.   Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.   Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard CPNI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 24, 2024                          Respectfully submitted,

/s/    John Morrison
John Morrison
**MORRISON SHERWOOD**
**WILSON DEOLA, PLLP**
401 N. Last Chance Gulch
Helena, MT 59601
Tel: 406-442-3261
john@mswdlaw.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff David Hornthal*

*Pro hac vice* forthcoming